PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-2080

_____

AUTO-OWNERS INSURANCE COMPANY

v.

STEVENS & RICCI INC.;
HYMED GROUP CORPORATION


HYMED GROUP CORPORATION,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-12-cv-07228)
Magistrate Judge:  Hon. Henry S. Perkin

_____

Argued
January 20, 2016

Before:  JORDAN, HARDIMAN, and GREENAWAY, JR.,
*Circuit Judges*.

(Opinion Filed: September 1, 2016)
_____

Jeffrey A. Berman
David M. Oppenheim   [ARGUED]
Anderson & Wanca
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008

Phillip A. Bock
Bock & Hatch, LLC
134 N. LaSalle Street, Suite 1000
Chicago, IL 60602

Ann M. Caldwell
Caldwell Law Office, LLC
108 W. Willow Grove Avenue, Suite 300
Philadelphia, PA 19118
        *Counsel for Appellant*

Robert S. Stickley
Langsam Stevens Silver & Hollaender, LLP
1818 Market Street, Suite 3400
Philadelphia, PA 19103

Timothy P. Tobin   [ARGUED]
Gislason & Hunter LLP
701 Xenia Ave. South
Suite 500
Minneapolis, MN 55416
        *Counsel for Appellee*

_____

OPINION OF THE COURT

---

JORDAN, *Circuit Judge*.

In this insurance coverage dispute, Auto-Owners Insurance Company ("Auto-Owners") seeks a declaration that it has no obligation to defend or indemnify its insured, Stevens & Ricci, Inc. ("Stevens & Ricci"), in connection with a $2,000,000 judgment entered against Stevens & Ricci as part of the settlement of a class action lawsuit. In that class action, the Hymed Group Corporation ("Hymed") alleged, as representative of the class, that Stevens & Ricci had violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by sending unsolicited fax advertisements. While that class action was pending, Auto-Owners filed this declaratory judgment action in the United States District Court for the Eastern District of Pennsylvania against both Stevens & Ricci and Hymed.[1] Auto-Owners and Hymed filed cross-motions for summary judgment. In its motion, Auto-Owners argued that the terms of the insurance policy did not obligate it to indemnify or defend Stevens & Ricci in the class action; Hymed argued, to the contrary, that the policy required Auto-Owners to pay the judgment on behalf of its insured.[2] The

---

[1] By agreement of the parties, the declaratory judgment action was heard before a magistrate judge, who was thus empowered to enter final judgment. 28 U.S.C. § 636(c).

[2] As more fully explained herein, Hymed, rather than Stevens & Ricci, ended up making these coverage arguments because Stevens & Ricci settled its stake in the coverage dispute in a manner that effectively made Hymed the party

3

District Court concluded that the sending of unsolicited fax advertisements in violation of the TCPA did not fall within the terms of the insurance policy, and thus granted Auto-Owners's motion for summary judgment and denied Hymed's cross-motion. Because we agree that the insurance policy does not cover the judgment in the underlying class action, we will affirm.

## I. BACKGROUND

This case began with the improper use of what now seems an old-fashioned method of communication: fax machines. Stevens & Ricci was solicited by an advertiser claiming to have a fax advertising program that complied with the TCPA. Relying on that representation, Stevens & Ricci allowed the advertiser to fax thousands of advertisements to potential customers on its behalf. The advertiser sent 18,879 unsolicited advertisements by fax in February 2006.

Much later, on June 1, 2012, Hymed filed a class action lawsuit in the United States District Court for the Eastern District of Pennsylvania against Stevens & Ricci, claiming that the advertisements actually did violate the TCPA, *see Hymed Grp. Corp. v. Stevens & Ricci, Inc.*, Civil Action No. 12-CV-3093 (the "Underlying Action"), which prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement … ." 47 U.S.C. § 227(b)(1)(C). Hymed asserted that it and other class

---

most interested in securing coverage. *See infra* at pp. 6-7, 9 n.7.

4

members – numbering, per the complaint, "more than 39 other recipients" (J.A. at 545) – had not invited or given permission to Stevens & Ricci to send the faxes. Hymed's complaint further charged that the unsolicited faxes had damaged the recipients by causing them to waste paper and toner consumed in the printing process and to lose the use of their fax machines when the advertisements were being received. In Hymed's words, the "junk faxes" had also interrupted the class members' "privacy interest in being left alone." (J.A. at 549-50.) For relief, Hymed sought actual or statutory damages, whichever was greater, and an injunction against future violations. Given the volume of faxes sent, a finding of liability to the class under the TCPA, with statutory damages of $500 per fax, 47 U.S.C. § 227(b)(3)(B), could have resulted in a damage award in the Underlying Action of $9,439,500, before trebling.[3] Such a judgment could have bankrupted Stevens & Ricci and caused the dissolution of its business.

During the time that Stevens & Ricci had the unsolicited faxes sent to Hymed and other class members, it was covered by a "Businessowners Insurance Policy" (the "Policy") issued by Auto-Owners. (J.A. at 555.) The Policy obligates Auto-Owners to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', 'personal injury' or 'advertising injury' to which this insurance applies." (J.A. at 563.) The present dispute centers on whether the sending of unsolicited faxes inflicted two of those four types of injury on

---

[3] The TCPA permits trebling of statutory damages if the defendant acted "willfully or knowingly" in violating the statute. 47 U.S.C. § 227(b)(3).

the members of the class: property damage and advertising injury.

The term "property damage" is defined in the Policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (J.A. at 576.) For "property damage" to be covered under the Policy, it must be caused by an "occurrence" (J.A. at 563), which the Policy defines as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions" (J.A. at 575). Despite its use of the term, the Policy does not separately define an "accident," though it does exclude from coverage any property damage "expected or intended from the standpoint of the insured." (J.A. at 564-65.)

The Policy defines "advertising injury" as injury arising out of one or more of the following events:

> a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> b. Oral or written publication of material that violates a person's right of privacy;

> c. Misappropriation of advertising ideas or style of doing business; or

> d. Infringement of copyright, title or slogan.

6

(J.A. at 573.) To be covered, an "advertising injury" must also be inflicted "in the course of advertising [the insured's] goods, products or services." (J.A. at 563.)

Auto-Owners agreed to defend Stevens & Ricci in the Underlying Action, but reserved its right to later challenge whether the alleged misconduct (*i.e.*, the sending of unsolicited faxes) fell within the terms of the insurance policy's coverage. In November 2013, Hymed, Stevens & Ricci, and Auto-Owners reached an agreement to compromise and settle the Underlying Action. Among other things, the parties agreed to entry of judgment in favor of the class, and against Stevens & Ricci, in the amount of $2,000,000. Hymed and the class also agreed to seek recovery to satisfy the judgment only from Auto-Owners under the Policy. On December 4, 2014, the District Court in the Underlying Action entered an order and final judgment approving the settlement and entering the judgment against Stevens & Ricci. In its order, the Court specifically found that Stevens & Ricci "did not willfully or knowingly violate the TCPA." (J.A. at 24.)

By that time, Auto-Owners had already filed this case to clarify its obligations under the Policy. In particular, on December 28, 2012, Auto-Owners filed the present declaratory judgment action, pursuant to 28 U.S.C. § 2201, against Stevens & Ricci and Hymed, seeking a declaration that the Policy did not provide coverage for Hymed's claims in the Underlying Action and that Auto-Owners thus did not owe Stevens & Ricci any duty to defend or indemnify.[4] It

---

[4] Hymed had previously filed a declaratory judgment action on the coverage question in the United States District

7

filed an amended complaint on January 3, 2013. Stevens & Ricci never entered an appearance or filed a response.[5] Auto-Owners and Hymed each moved for summary judgment, and the District Court concluded that the sending of unsolicited faxes to Hymed and other class members did not cause the sort of injury that falls within the Policy's definition of either "property damage" or "advertising injury." Accordingly, the Court granted Auto-Owners's motion for summary judgment

---

Court for the Eastern District of Michigan. That case was dismissed for improper venue, because venue was proper in the United States District Court for the Eastern District of Pennsylvania, where the Underlying Action was then pending. *See Hymed Grp. Corp. v. Auto Owners Ins. Co.*, No. 12-12519, 2012 WL 6642645 (E.D. Mich. Dec. 20, 2012). On the day that case was dismissed, Hymed filed another declaratory judgment action, this time in the Western District of Michigan. That case was then transferred to the Eastern District of Pennsylvania and consolidated with the instant case in April 2014 by agreement of the parties. The parties stipulated that Hymed's declaratory judgment complaint would be treated as a counterclaim in the case filed by Auto-Owners.

[5] It appears that, despite having been served, Stevens & Ricci never filed an answer to Auto-Owners's amended complaint seeking a declaratory judgment. The District Court did not issue a default judgment against it, however, opting instead to dismiss Auto-Owners's motion for a default judgment without prejudice to Auto-Owners's opportunity to argue later, in its motion for summary judgment, that declaratory relief should be granted against all defendants, including the absent Stevens & Ricci.

8

and denied Hymed's cross-motion. Hymed promptly appealed.

## II. DISCUSSION

### A. Jurisdiction

This is an action under the Declaratory Judgment Act, 28 U.S.C. § 2201. That Act does not itself create an independent basis for federal jurisdiction but instead provides a remedy for controversies otherwise properly within the court's subject matter jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950). In bringing its action, Auto-Owners invoked the District Court's diversity jurisdiction under 28 U.S.C. § 1332, which has two requirements for the establishment of jurisdiction. First, the parties must be completely diverse, meaning that "no plaintiff can be a citizen of the same state as any of the defendants." *Grand Union Supermarkets of the V.I., Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003). For jurisdictional purposes, "a corporation is a citizen of both its state of incorporation and the state 'where it has its principal place of business.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 347 (3d Cir. 2013) (quoting 28 U.S.C. § 1332(c)(1)). Here, there is no dispute that the parties are completely diverse: Auto-Owners is based and incorporated in Michigan, while Stevens & Ricci is based and incorporated in Arizona, and Hymed is based and incorporated in Pennsylvania.[6]

---

[6] We need not address the citizenship of the various unnamed members of the class. For one, those unnamed individuals are not parties to this declaratory judgment action.

9

The second requirement for federal jurisdiction under the diversity statute is that the "matter in controversy exceeds the sum or value of $75,000 … ." 28 U.S.C. § 1332(a). Meeting that requirement here is not as straightforward as it may first appear. Although Auto-Owners and Hymed are ultimately fighting over the insurer's need to pay a $2,000,000 judgment against its insured, that judgment is based on the settlement of an underlying class action lawsuit in which the individual claims of each class member fell well below the $75,000 amount-in-controversy threshold. In general, the distinct claims of separate plaintiffs cannot be aggregated when determining the amount in controversy. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002). Given that anti-aggregation rule, we solicited supplemental briefing from the parties to address "whether and how the amount-in-controversy requirement for federal diversity jurisdiction is met in this case." [7] Hymed now

---

Even if this were the Underlying Action, "in a federal class action only the citizenship of the named class representatives must be diverse from that of the defendants." *In re Sch. Asbestos Litig.*, 921 F.2d 1310, 1317 (3d Cir. 1990).

[7] We also solicited supplemental briefing on the question of whether Hymed has proper Article III standing, as required for jurisdiction, "to participate in an action seeking a declaration of rights under an insurance contract to which it is not a party." On that issue, the parties agree – correctly – that Hymed does have standing. That standing is rooted in our previous recognition that, in a declaratory judgment action concerning the scope of an insurance policy, "the injured party has an independent right to present its case upon the ultimate issues, apart from that of the insured, because 'in

10

argues that the District Court's exercise of diversity jurisdiction ran afoul of the anti-aggregation rule, and the Court thus acted without jurisdiction in granting Auto-Owners's motion for summary judgment.[8]

As the party invoking diversity jurisdiction, Auto-Owners bears the burden to prove, by a preponderance of the evidence, that the amount in controversy exceeds $75,000. *Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 506-07 (3d Cir. 2014). But that burden is not especially onerous. In reviewing the complaint, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul*

---

many of the liability insurance cases, the most real dispute is between the injured third party and the insurance company, not between the injured and oftentimes impecunious insured.'" *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 319 (3d Cir. 2011) (quoting *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 354 (3d Cir. 1986)).

[8] It is perhaps not a coincidence that Hymed only discovered its concern about the District Court's jurisdiction after losing in that Court. But, because the amount-in-controversy issue goes to jurisdiction, it is immaterial that it only arose on appeal. As we have previously held, "if it develops that the requisite amount in controversy was never present, even if that fact is not established until the case is on appeal, the judgment of the District Court cannot stand." *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 218 (3d Cir. 1999), *abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).

11

*Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938). "Accordingly, the question whether a plaintiff's claims pass the 'legal certainty' standard is a threshold matter that should involve the court in only minimal scrutiny of the plaintiff's claims." *Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir. 1997).

In making that assessment, "[t]he temporal focus of the court's evaluation … is on the time that the complaint was filed." *Id.*; *see also Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 152 (3d Cir. 2009) ("[U]nder a long-standing rule, federal diversity jurisdiction is generally determined based on the circumstances prevailing at the time the suit was filed."). Subsequent events cannot reduce the amount in controversy so as to deprive the district court of jurisdiction, *St. Paul Mercury Indem.*, 303 U.S. at 293, nor can later events increase the amount in controversy and give rise to jurisdiction that did not properly exist at the time of the complaint's filing. For our purposes, that means we assess whether Auto-Owners met the amount-in-controversy threshold by considering only the circumstances that existed in January 2013, when Auto-Owners filed its amended complaint in this case. Because that was long before the parties reached their $2,000,000 settlement of the Underlying Action, we must determine whether the amount in controversy exceeded $75,000 before the settlement made clear the value of Hymed's underlying claims.

In its amended complaint, Auto-Owners alleged that the amount in controversy exceeded $75,000. Typically, "[s]uch a general allegation when not traversed is sufficient, unless it is qualified by others which so detract from it that the court must dismiss sua sponte or on defendants' motion."

12

*Gibbs v. Buck*, 307 U.S. 66, 72 (1939). Auto-Owners based its allegation on averments in the then-pending Underlying Action,[9] which claimed that Stevens & Ricci had violated the TCPA, that statutory damages were $500 per violation, and that "more than 39 other recipients" had received the faxes without their permission. (J.A. at 545.) Thus, at a minimum, Auto-Owners's potential financial exposure when it filed its amended complaint was $20,000, *i.e.*, $500 statutory damages for each of 40 fax recipients. But the complaint in the Underlying Action also noted that damages could be trebled, further increasing that minimum to $60,000. Again, that sum represents the minimum exposure, given trebling, and the complaint in the Underlying Action specifically noted that "*more than* 39" other individuals received the disputed faxes, with no limitation. (J.A. at 545 (emphasis added).) Using the statutory measure of damages and considering the potential for trebling, only eleven additional faxes would be necessary for damages to exceed $75,000.[10] Importantly, the $60,000

---

[9] In assessing whether the amended complaint sufficiently alleged jurisdiction, we may also consider "documents referenced therein and attached thereto." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Here, that includes Hymed's complaint in the Underlying Action, as the amended complaint in the instant case repeatedly relies upon Hymed's own allegations.

[10] As it turned out, thousands of unsolicited faxes had been sent to a like number of recipients, so that the actual amount of the purported damages at the time the complaint was filed was plainly adequate, even if not known at the time. *See State Farm Mut. Auto. Ins. Co. v. Powell*, 87 F.3d 93, 97 (3d Cir. 1996) (distinguishing between subsequent *events* that

minimum does not include the expense Auto-Owners would certainly incur in providing a legal defense against Hymed's class action, as the Policy imposes on Auto-Owners a "duty to defend" its insured. (J.A. at 563.) That cost of defense in the Underlying Action, which can fairly be assumed to be well in excess of the $15,000 difference between $60,000 and the $75,000 jurisdictional threshold, is properly included in determining the amount in controversy here. *See State Farm Mut. Auto. Ins. Co. v. Powell*, 87 F.3d 93, 98 (3d Cir. 1996) ("[W]here the underlying instrument or contract itself provides for their payment, costs and attorneys' fees must be considered in determining the jurisdictional amount" (internal quotation marks omitted).).[11]

---

change the amount in controversy and subsequent *revelations* that clarify whether the amount in controversy was in fact met at the time the action was filed, and permitting the latter to be considered for assessing the "factual reality" underlying jurisdiction).

[11] Attorney's fees do not generally constitute part of the amount in controversy because the successful party typically does not collect its attorney's fees. As an exception to that rule, however, courts include attorney's fees in the amount-in-controversy calculation when, as in this case, their payment is provided for by the terms of an underlying contract. *See* 14AA Charles Alan Wright et al., *Federal Practice & Procedure* § 3712 (4th ed. 2016) ("[T]he amount expended for attorney's fees are a part of the matter in controversy for subject matter jurisdiction purposes when they are provided for by contract … , since these are part of the liability being enforced. … The same is true when the action is for indemnification for a prior judgment plus the

We have previously recognized that "the amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993). Here, in light of the costs that Auto-Owners would incur if required to defend the Underlying Action and the plausibility of there being a few additional fax recipients, we cannot say to a legal certainty that Auto-

---

attorney's fees incurred in defending the earlier action."); *Springstead v. Crawfordsville State Bank*, 231 U.S. 541, 541-42 (1913) ("Could such an attorney's fee be considered in determining whether the jurisdictional amount was involved? We think so. … [T]he moment suit was brought the liability to pay the fee became a 'matter in controversy,' and as such to be computed in making up the required jurisdictional amount … ."); *see also Farmers Ins. Co. v. McClain*, 603 F.2d 821, 823 (10th Cir. 1979) (holding that an insurer's potential losses for amount-in-controversy purposes can include the cost of its defense of its insured in an underlying suit); *Stonewall Ins. Co. v. Lopez*, 544 F.2d 198, 199 (5th Cir. 1976) (per curiam) ("The pecuniary value of the obligation to defend the separate lawsuit is properly considered in determining the existence of the jurisdictional amount … ."). Here, Auto-Owners seeks a declaration of its rights under an insurance policy that provides for both indemnification and defense. Thus, at the time Auto-Owners filed this declaratory judgment case, its possible losses were not limited only to the value of any potential judgment that might have arisen out of the Underlying Action. Those losses also included the costs it would incur if required to represent Stevens & Ricci in that case.

Owners's declaratory judgment action was valued at or below $75,000 when it was filed. We likewise cannot conclude that the complaint's allegation that the amount in controversy exceeded $75,000 was made in bad faith.

Consistent with that conclusion, Hymed does not argue that Auto-Owners claimed more than $75,000 in bad faith.[12] Instead, it contends that, by adding up the potential damages owed to each of the various class members, Auto-Owners is improperly aggregating those claims to cross the jurisdictional threshold. Again, the "claims of several plaintiffs, if they are separate and distinct, cannot be aggregated for purposes of determining the amount in controversy." *Werwinski*, 286 F.3d at 666 (internal quotation marks omitted).[13] Although declaratory judgment actions do not directly involve the award of monetary damages, "it is well established that the amount in controversy [in such

---

[12] It would be awkward for Hymed to even imply there was less than good faith, given that, in both of the declaratory judgment actions it filed in Michigan federal courts, *see supra* note 4, it had itself invoked federal diversity jurisdiction and alleged that the amount in controversy exceeded $75,000.

[13] The Supreme Court has recognized one limitation on the anti-aggregation rule, which is inapplicable here. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) (holding that the supplemental jurisdiction statute permits the exercise of diversity jurisdiction over additional plaintiffs who fail to satisfy the minimum amount-in-controversy requirement, as long as the other elements of diversity jurisdiction are present and at least one named plaintiff does satisfy the amount-in-controversy requirement).

actions] is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977); *see also* 14AA Charles Alan Wright et al., *Federal Practice & Procedure* § 3708 (4th ed. 2016) ("With regard to actions seeking declaratory relief, the amount in controversy is the value of the right or the viability of the legal claim to be declared, such as a right to indemnification or a duty to defend.").

Hymed argues that the "object of the litigation" here is resolution of a dispute between the many members of the class and the insurer, and that Auto-Owners can thus only satisfy the amount-in-controversy requirement by improperly aggregating those various claims. To Hymed, "this action always has been a multi-party dispute between Auto-Owners and the multiplicity of class claimants." (Hymed Jan. 8, 2016 Letter Br. at 9.) Unsurprisingly, Auto-Owners disagrees, viewing the case as a unitary controversy between it and its insured. Taking that perspective, Auto-Owners argues that, "in coverage litigation commenced by an insurer, the focus is on the amount the insurer will owe to its insured or the value of its coverage obligation." (Auto-Owners Jan. 4, 2016 Letter Br. at 1.) Given those two competing positions, we must decide whether this case is properly viewed as a dispute between Auto-Owners and the many class members – which would give rise to aggregation problems – or as a dispute between Auto-Owners and its insured concerning its overall obligation to defend and indemnify under the Policy.

Although we have never before spoken precedentially on this question,[14] we find persuasive the opinion of the United States Court of Appeals for the Seventh Circuit in *Meridian Security Insurance Company v. Sadowski*, 441 F.3d 536 (7th Cir. 2006) (Easterbrook, J.). There, much like here, an insurer sought a declaratory judgment against its insured to avoid any obligation to defend a class action alleging that the insured had sent unsolicited fax advertisements in violation of the TCPA. *Id*. at 537. Also as here, the underlying class action was still pending at the time the declaratory judgment action was filed. *Id*. at 538. In concluding that the district court indeed had diversity jurisdiction, the Seventh Circuit rejected the very argument that Hymed now advances. According to that court, "[the insurer] has not aggregated multiple parties' claims. From its perspective there is only one claim – by its insured, for the sum of defense and indemnity costs." *Id*. at 539. The Seventh Circuit thus held that "the anti-aggregation rule does not apply … just because the unitary controversy between these parties reflects the sum of many smaller controversies. No more need be said on this subject." *Id*.[15]

---

[14] We have previously concluded, in a pair of non-precedential opinions, that the district court does have jurisdiction under such circumstances, though we did not address the amount-in-controversy requirement in any detail. *Nationwide Mut. Ins. Co. v. David Randall Assocs., Inc.*, 551 F. App'x 638, 639 n.1 (3d Cir. 2014); *St. Paul Fire & Marine Ins. Co. v. Brother Int'l Corp.*, 319 F. App'x 121, 124 (3d Cir. 2009).

[15] Each case that Hymed cites to the contrary is readily distinguishable. It primarily relies on two cases – *Siding &*

18

*Insulation Co. v. Acuity Mut. Ins. Co.*, 754 F.3d 367 (6th Cir. 2014), and *Travelers Prop. Cas. v. Good*, 689 F.3d 714 (7th Cir. 2012). Although *Siding* also involved class claims against an insured based on the TCPA, the declaratory judgment action in that case was commenced by a class representative, not the insurer, and that action did not include the insured. 754 F.3d at 368. The Sixth Circuit, looking at the case from the perspective of the plaintiff class representative, dismissed the case for lack of jurisdiction, holding that the only way the class members could meet their amount-in-controversy burden was by aggregating their claims. *Id*. at 371-72. Here, Auto-Owners commenced the declaratory judgment action. Following the logic of *Siding* and taking the case from the perspective of the plaintiff – here, the insurer rather than the class – the amount in controversy is properly regarded as the entire sum Auto-Owners could owe under the Policy.

At first glance, *Good* more closely resembles the present suit. The insurer in that case filed the declaratory judgment action against its insured, but did so only *after* the settlement of the underlying class action for $16 million. *Good*, 689 F.3d at 716-17. That settlement agreement assigned to the class members all of the insured's claims against and rights to payment from the insurer. *Id*. at 716. As a result, the indemnity rights that the insurer was litigating had been functionally parceled by the terms of the settlement, thus requiring the court to aggregate the insurer's obligation to each member of the class to reach the jurisdictional minimum. The Seventh Circuit declined to do so. And because it had previously issued *Sadowski*, the court distinguished that prior case on the very grounds we also now rely upon:

19

> The decisive difference between this case and [*Sadowski*] is that at the time the insurer filed the declaratory judgment action in that case, the insured's arguable right to recover under its policy was still completely its own. No assignment had been made. By the time [the insurer] filed this action, however, [the insured] had already assigned its claims to the members of the *Good* class, and no individual class member had a claim for more than $75,000. … Once [the insured] made the assignment of rights, this was no longer a "unitary controversy" between the insurer and its insured. It had become a multi-party dispute between [the insurer] and thousands of class claimants. [*Sadowski*] is inapposite.

*Id*. at 718. Here, as in *Sadowski*, Stevens & Ricci's right to recovery had not been divided among the class members at the time the declaratory judgment complaint was filed. The subsequent settlement in the Underlying Action did not revoke the jurisdiction that had been established.

We recognize that this results in a situation in which an insurer can invoke federal jurisdiction in a declaratory judgment action while class members cannot. Echoing that notion, the Dissent says we are taking an "insurance-company viewpoint approach" to the amount-in-controversy question. (Dissent Op. at 10.) But our decision reflects no partiality. The fact that Auto-Owners can invoke federal jurisdiction simply follows from application of the amount-in-controversy requirement and its accompanying anti-aggregation rule. To Auto-Owners, the amount in controversy exceeds $75,000; we need not aggregate claims to cross that threshold. To each

20

We agree and now adopt *Sadowski*'s reasoning as our own. Viewing this case from the perspective of the insurer at the time of filing of the declaratory judgment complaint, Auto-Owners's quarrel was with Stevens & Ricci regarding its indemnity obligation under the Policy. The only "amount in controversy" that the insurer was then concerned with was its total indemnity and defense obligation; it presumably had no interest in the way the indemnity sum might later be divided among the various class members. Its dispute was thus with its insured, not the class. And its overall liability (as established above) was not legally certain to fall below the jurisdictional minimum.

---

member of the class, the amount in controversy falls short. Only one party may invoke our diversity jurisdiction because only that party has the requisite amount at stake. We note, however, that any concern about one-sidedness should be mitigated by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), which vests district courts with jurisdiction over class actions where the *aggregate* amount in controversy exceeds $5,000,000 and the parties are minimally diverse. As a consequence, class action plaintiffs may satisfy the amount-in-controversy requirement necessary for federal jurisdiction if their individual claims exceed $75,000 or if the total aggregate claims of the class exceed $5,000,000. Here, the aggregate statutory damages of the class, as subsequent revelations have made clear, *see supra* note 10, perhaps exceeded the CAFA threshold. In future cases, if class members cannot satisfy either amount, they are not then entirely without any opportunity for declaratory relief; they just need to proceed in state court.

Our dissenting colleague disagrees, and would dismiss this case for lack of subject-matter jurisdiction. He first points out that "Hymed, not Stevens & Ricci, Inc., has been defending the suit from the beginning," and "Stevens & Ricci has not so much as entered an appearance in the matter." (Dissent Op. at 1-2.) But that is not something we may consider, because – as already noted – "federal diversity jurisdiction is generally determined based on the circumstances prevailing at the time the suit was filed." *Kaufman*, 561 F.3d at 152. Auto-Owners filed this declaratory judgment action against both Stevens & Ricci and Hymed at a time when the Underlying Action was still pending. The fact that only Hymed is *now* defending this case does not alter the circumstances that existed at the time it was filed.

Next, the Dissent says there is tension between our standing jurisprudence, "in which we have stressed that parties like Hymed have a significant stake" in insurance coverage actions, and our amount-in-controversy conclusion that "parties like Hymed cannot assert federal jurisdiction in declaratory actions seeking similar relief." (Dissent Op. at 2.) There is no such tension. Standing and amount-in-controversy are two distinct inquiries. Hymed certainly had standing to participate in this insurance coverage action, *see supra* note 7, but that does not alter the $75,000 amount-in-controversy threshold that it must meet in order for the dispute to fall within our jurisdiction.

The Dissent then cites *In re Ford Motor Co./Citibank (South Dakota), N.A.*, 264 F.3d 952, 958 (9th Cir. 2001) for the proposition that we should look directly "to Hymed's underlying suit to determine the amount in controversy."

22

(Dissent Op. at 6.) But *Ford* involved multiple plaintiffs who each sought injunctive relief. 264 F.3d at 955-56. In dismissing that case, the United States Court of Appeals for the Ninth Circuit took the same plaintiff-focused approach that we now take and held that the amount at stake "depend[s] upon the nature and value of the right asserted" by each plaintiff. *Id*. at 959. Our approach here is thus entirely consistent with *Ford*.[16] The Dissent nonetheless labors to create an aggregation problem. Indeed, its approach to determining the amount in controversy in declaratory judgment cases – to effectively ignore the declaratory judgment action altogether and look only at the Underlying Action – is unprecedented.[17] We must look to the Underlying

---

[16] Despite the Dissent's charge to the contrary, our approach is also consistent with our opinion in *Packard v. Provident National Bank*, 994 F.2d 1039 (3d Cir. 1993). *Packard* involved a claim by various class members against a bank, and the parties sought to avoid aggregation problems by arguing that the jurisdictional amount should be measured by the costs to the bank rather than the damages of each plaintiff. 994 F.2d at 1050. We held that permitting that method of measurement would create aggregation problems. *Id*. But that is not what happened here. In this case, Auto-Owners filed suit against its one insured and Hymed. Were the case reversed, *Packard* might prove relevant. As it stands, the plaintiff in the declaratory judgment action (Auto-Owners) is not aggregating claims to meet the amount-in-controversy requirement.

[17] Our dissenting colleague takes issue with this characterization but cites no cases that have ever taken his view.

23

Action to discern the *value* of the right being litigated here, but we cannot, and do not, ignore party status when determining whether the plaintiff *in the case before us* is improperly aggregating claims to reach the jurisdictional threshold. From Auto-Owners's perspective, the basic dispute is one between it and its insured over the scope of overall insurance coverage. Principles of anti-aggregation thus remain intact.

The Dissent goes on to change tack, arguing that "the total amount potentially owed by Auto-Owners [in the Underlying Action] also falls short of the $75,000 threshold." (Dissent Op. at 6.) On that score, we simply disagree. It is difficult for us to say to a legal certainty that less than $75,000 is at stake in this case, where damages from the faxes alone were known to be at least $60,000, the complaint specifically said that more individuals received the faxes in question, and only eleven additional faxes would be necessary to cross the jurisdictional threshold. In apparent recognition of those facts, neither party has even raised this argument. And, of course, subsequent revelations show that, at the time of the complaint, over 18,000 faxes had actually been sent, placing a great deal more than $75,000 at issue. *See Powell*, 87 F.3d at 97; *supra* note 10. In any event, we are attuned to the admonition that "the amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993). The Supreme Court has likewise instructed that we may only dismiss if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co.*, 303 U.S. at 288-89. We do not share our dissenting colleague's certainty.

24

Finally, the Dissent would not take into account potential attorney's fees when determining the amount in controversy here, and faults us for an "unnecessary expansion of our jurisprudence" on the subject. (Dissent Op. at 8-9.) Even if we were to set attorney's fees aside entirely, that would not change our conclusion that the amount in controversy exceeds $75,000, for the reasons just set forth. But we ought not discount those costs. As we have endeavored to explain, *supra* note 11, Auto-Owners is seeking a declaration of its rights and responsibilities with respect to a contract that requires it to pay its insured's defense costs. Our precedent on the subject is straightforward: "costs and attorneys' fees should be considered part of the amount in controversy for jurisdictional purposes when they are mandated by underlying instruments or contracts." *Powell*, 87 F.3d at 98.[18] Here, the underlying

---

[18] Our dissenting colleague says we are "tak[ing] *Powell* out of context," and uses a block quotation from that case to shed light on its reasoning. (Dissent Op. at 7.) One could read that block quote, as the Dissent does, as expressing some doubt about the rule of law discussed in the case. But that is not so. *Powell* recognized the common-sense notion that if the payment of attorney's fees is provided for by an underlying contract, then those fees should be considered for amount-in-controversy purposes. 87 F.3d at 98. The prevailing party will be awarded those fees, so they are quite clearly "in controversy." In support of that proposition, the *Powell* Court cited the same two cases, *Springstead* and *McClain*, which we have also cited. *See Powell*, 87 F.3d at 98; *supra* note 11. Until today, there was no debate about that rule. Indeed, after collecting some thirty cases to that effect, a leading treatise describes the law on this question as

25

insurance contract mandates that Auto-Owners pay its insured's defense costs, including fees. As the Dissent points out, Auto-Owners's duty to defend Steven & Ricci "only applies to suits that fall within coverage." (Dissent Op. at 7.) That is exactly right, which means that the obligation to pay attorney's fees rises and falls with the outcome of this coverage dispute. That obligation is thus an inseparable part of the "amount in controversy" between Auto-Owners and Stevens & Ricci. To ignore those costs is to ignore the reality of what is at stake in this litigation.

---

"now quite settled." 14AA Charles Alan Wright et al., *Federal Practice & Procedure* § 3712 (4th ed. 2016).

The problem we identified in *Powell* was that a previous district court opinion on which a party to the case had relied – *Nationwide Mut. Ins. Co. v. Rowles*, 818 F. Supp. 852 (E.D. Pa. 1993) – had used that correct rule of law and applied it in an improper context. In *Rowles*, the arbitration provision in the underlying contract provided that the costs of arbitration would be shared evenly by the parties. *Powell*, 87 F.3d at 98. Thus, the amount was not "in controversy" at all; it would be borne equally regardless of the outcome of the arbitration or litigation. So, when *Powell* "question[ed] the reasoning of the district court's decision in *Rowles*," 87 F.3d at 98, it did not call into doubt a settled rule of law. Instead, the *Powell* Court took issue with whether *Rowles* had correctly applied that rule of law to the case at hand – a case in which the underlying contract did not make the payment of fees depend upon the outcome of the litigation. Here, by contrast, the insurance coverage dispute also resolves the fee payment dispute; if the claim is covered, then Auto-Owners will pay the fees, and vice-versa. The present case thus fits easily into the settled rule the *Powell* Court discussed.

Accordingly, satisfaction of the amount-in-controversy requirement in this case does not violate the anti-aggregation rule, and the District Court had diversity jurisdiction under 28 U.S.C. § 1332.

## B.    Standard of Review

Both parties moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).  "This standard does not change when the issue is presented in the context of cross-motions for summary judgment."  *Appelmans*, 826 F.2d at 216.  When both parties move for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016).  On appeal, "[w]e exercise plenary review over an order resolving cross-motions for summary judgment," *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 366 (3d Cir. 2011), applying the same standard that the lower court was obligated to apply under Rule 56, *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 194 (3d Cir. 2002).

27

### C.     Analysis

A federal court sitting in diversity must apply state substantive law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). Here, the ultimate merits question is whether the sending of faxes in the described circumstances fell under the Policy's definition of either "property damage" or "advertising injury," as a matter of state law.[19] But before reaching that question, we must determine which state's law to apply. The parties disagree on that point. Auto-Owners urges Pennsylvania law, given Pennsylvania's role as the forum state for both this declaratory judgment case and the Underlying Action. Hymed, on the other hand, says that Arizona law should apply. It emphasizes the many connections between the Policy and that state: Stevens & Ricci is based and incorporated there; the underwriting file on

---

[19] Hymed makes no argument concerning the scope of Auto-Owners's duty to defend Stevens & Ricci, as distinct from its duty to indemnify. Hymed argues only that Auto-Owners must indemnify its insured per the Policy, and thus pay the $2,000,000 settlement. Subject to the terms of the insurance policy, an insurer's duty to defend may be broader than its duty to indemnify. *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 n.7 (Pa. 2006). But we need not consider the extent of Auto-Owners's duty to defend its insured given the absence of any argument on this issue. *Albrecht v. Horn*, 485 F.3d 103, 113 n.3 (3d Cir. 2007) ("An issue that is not discussed in the briefs is waived."). We thus address only the scope of Auto-Owners's duty to indemnify under the Policy – that is, its obligation to pay the $2,000,000 judgment.

the Policy indicates that the insurance quote was by an agency based in Tucson; the application for insurance was submitted to the Auto-Owners branch in Mesa and reviewed by an underwriter there; and the decision to insure Stevens & Ricci was made entirely within the Mesa branch. Essentially, Hymed argues that Arizona law should apply because that is where the insurance contract was formed.[20]

Because the Policy itself did not contain a choice-of-law provision, to determine which state's substantive law applies we "must apply the choice of law rules of the forum state." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)). As in all applications of state law, our task "is to predict how the [state] Supreme Court would rule if it were deciding this case." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91-92 (3d Cir. 2008). This action was filed in the Eastern District of Pennsylvania, so we apply Pennsylvania choice-of-law rules. In contract cases, those rules are not entirely settled. Before 1964, Pennsylvania courts applied the law of the place where the contract was formed ("lex loci contractus"). That stood in contrast to the rule in tort cases, which required application of the law of the place where the injury occurred ("lex loci delicti"). In *Griffith v. United Air Lines, Inc.*, the Pennsylvania Supreme Court abandoned the "lex loci delicti" rule for torts "in favor of a more flexible rule which permits analysis of the policies

---

[20] Neither party has argued in favor of applying the law of Michigan, the state where Auto-Owners is based and where Hymed previously filed two declaratory judgment actions of its own, *see supra* note 4. We therefore do not consider Michigan in our choice-of-law analysis.

and interests underlying the particular issue before the court." 203 A.2d 796, 805 (Pa. 1964). The *Griffith* court did not address whether its new flexible approach to choice-of-law questions would also apply to contract claims, thus also displacing the "lex loci contractus" rule. Nor, in the years since, has the Supreme Court of Pennsylvania had occasion to answer that question.

But we have, twice. Almost 40 years ago, we "predict[ed] that Pennsylvania w[ould] extend its *Griffith* methodology to contract actions." *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1312 (3d Cir. 1978). More recently, in *Hammersmith v. TIG Insurance Co.*, we thoroughly analyzed subsequent precedent and again concluded that Pennsylvania would apply *Griffith*'s flexible approach to choice-of-law questions in contract cases. 480 F.3d 220, 226-29 (3d Cir. 2007). In particular, we emphasized that, in *Budtel Associates, LP v. Continental Casualty Company*, the Pennsylvania Superior Court had concluded "[a]fter careful reflection" that the "spirit and weight of th[e] Commonwealth's precedents mandate we follow the *Griffith* rule in the contract law context." *Id*. at 228 (quoting *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 644 (Pa. Super. Ct. 2006)). Although Hymed argues that the previous "lex loci contractus" rule should control – and thus we should apply Arizona law – it cites no intervening Pennsylvania authority that calls our prediction in *Hammersmith* into question. Accordingly, we will continue to follow our previous prediction and apply *Griffith*'s flexible choice-of-law analysis.

Under the *Griffith* approach, "the first step in a choice of law analysis under Pennsylvania law is to determine

30

whether a conflict exists between the laws of the competing states." *Budtel Assocs.*, 915 A.2d at 643. If there are no relevant differences between the laws of the two states, the court need not engage in further choice-of-law analysis, and may instead refer to the states' laws interchangeably. *Hammersmith*, 480 F.3d at 229-30. To determine whether a conflict exists, we must decide whether Arizona and Pennsylvania law disagree on the proper scope of the coverage applicable here.

Hymed cites "two significant conflicts" between Arizona and Pennsylvania substantive law. (Opening Br. at 17.) First, it contends that a basic Pennsylvania principle of contract interpretation – that courts enforce unambiguous policy language – does not apply to the interpretation of insurance contracts under Arizona law. Instead, as Hymed's argument goes, Arizona courts interpret insurance contracts by looking to the "reasonable expectations of the insured." (*Id*. at 18 (internal quotation marks omitted).) According to Hymed, "in Arizona, even clear and unambiguous boilerplate language is ineffective if it contravenes the insured's reasonable expectations." (*Id*.)

We reject that argument. To begin with, we do not agree that there is a conflict; both states, with limited exceptions not applicable here, give dispositive weight to clear and unambiguous insurance contract language.[21] But,

---

[21] Pennsylvania and Arizona generally apply clear and unambiguous language in an insurance contract. *See Erie Ins. Exch. v. Conley*, 29 A.3d 389, 392 (Pa. Super. Ct. 2011); *D.M.A.F.B. Fed. Credit Union v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 396 P.2d 20, 23 (Ariz. 1964). Indeed, both states

31

recognize that the written policy itself manifests the intention of the parties. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *Fireman's Fund Ins. Co. v. New Zealand Ins. Co.*, 439 P.2d 1020, 1021 (Ariz. 1968). As a narrow exception, Arizona does rely on the reasonable expectations of the parties to refuse enforcement of "even unambiguous boilerplate terms in standardized insurance contracts," but only in a "*limited* variety of situations." *Gordinier v. Aetna Cas. & Sur. Co.*, 742 P.2d 277, 283 (Ariz. 1987) (emphasis in original). Those limited situations involve either unambiguous language that is not sufficiently understandable to a reasonably-intelligent consumer, unusual terms that emasculate apparent coverage, or situations where the insurer's previous conduct created a mistaken impression of coverage despite clear language to the contrary. *Id.* at 283-84. That exception, contrary to Hymed's argument, is in line with Pennsylvania law, which also recognizes and protects the reasonable expectations of the insured "regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents" where policy terms may not be readily understandable, *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978), or to protect the insured from deception or unilateral changes to policy terms by the insurer, *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 925-26 (Pa. 1987).

That narrow exception is irrelevant here, however, as Hymed makes no argument that this case falls into any of those categories. Instead, Hymed seems to suggest that Arizona's law concerning insurance contract interpretation simply traces the expectations of the insured, and Arizona courts conclude that an insured has coverage if it reasonably *thinks* it has coverage. (*See* Reply Br. at 11 n.2 (arguing that,

even if a conflict existed on that broad interpretive principle, Hymed makes no effort to detail how or why the use of the "reasonable expectation" test would give rise to a relevant conflict in the substantive law applicable here. As best we can tell, Hymed is using the "reasonable expectation" test to empower it to conduct a fifty-state legal survey and to advocate that Arizona's law must be whatever the prevailing legal theory is across the country since that prevailing law is – given its popularity – inherently "reasonable." In Hymed's words, "to suggest that its proffered policy interpretation is consistent with a reasonable insured's expectations, Auto-Owners must demonstrate that the interpretation adopted explicitly or implicitly by courts nationwide is unreasonable." (Opening Br. at 18.) That argument misperceives the nature of our inquiry. When sitting in diversity and conducting a choice-of-law analysis pursuant to Pennsylvania conflict principles, our job is only to evaluate any conflict between the laws of Arizona and Pennsylvania. In its first purported "conflict," Hymed makes no argument that those two states' laws are different in any way that actually changes the meaning of either of the relevant terms of the Policy: "property damage" or "advertising injury." Its argument is thus not only wrong on the law – the states' laws do not conflict in how they interpret insurance contracts – but is also irrelevant because Hymed fails to connect the purported conflict to the law we must apply *in this case*.

---

under Arizona law, "the reasonable expectation of the insured is *controlling*" (original emphasis)).) That would allow the exception to swallow the rule, would be oddly one-sided, and is not the law of Arizona.

33

Hymed's second alleged conflict is more tenable and relates to differing interpretations of Arizona and Pennsylvania courts as to the meaning of "property damage." The Policy requires that any covered "property damage" be caused by an "occurrence" (J.A. at 563), which is defined as an "accident" (J.A. at 575). The Policy does not define the term "accident," though it does separately exclude from coverage any property damage "expected or intended from the standpoint of the insured." (J.A. at 565.) Hymed contends that the two states define an "accident" differently. Specifically, it says that the two states' laws are in conflict over whether an insurance policy that covers "accidents" would extend to the "unintended consequences of intentional acts," in this instance, damage to a fax recipient from an intentionally-sent fax. (Opening Br. at 19.)

Hymed argues that "a construction of Pennsylvania law" results in such damages being excluded from coverage. (Opening Br. at 19.) We agree. In *Donegal Mutual Insurance Co. v. Baumhammers*, the Supreme Court of Pennsylvania said that, when "accident" is undefined in an insurance policy, Pennsylvania courts should treat the term as "refer[ing] to an unexpected and undesirable event occurring unintentionally ...." 938 A.2d 286, 292 (Pa. 2007).

> [T]he key term in the definition of the "accident" is "unexpected" which implies a degree of fortuity. An injury therefore is not "accidental" if the injury was the natural and expected result of the insured's actions. ... *See also Minnesota Fire and Cas. Co. v. Greenfield*, 855 A.2d 854, 870 (Pa. 2004) ("'Accident' has been defined in the context of insurance

34

contracts as an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens.")

*Id*. (internal citations omitted). That definition comports with the basic purpose of insurance: "to cover only fortuitous losses." *United Servs. Auto. Ass'n v. Elitzky*, 517 A.2d 982, 986 (Pa. Super. Ct. 1986).

The intentional conduct of third parties may still be a covered "accident" under that definition. By way of example, *Baumhammers* involved a killing spree perpetrated by the son of the insured. 938 A.2d at 288. The estates of several of the victims sued both the son and his parents, alleging, among other claims, negligence on the part of the parents "in failing to take possession of [his] gun and/or alert law enforcement authorities or mental health care providers about [their son's] dangerous propensities." *Id*. at 291. The parents sought coverage under their insurance, which covered claims for bodily injury caused by an "accident." *Id*. at 288. The Supreme Court of Pennsylvania held that, with respect to the insured parents, the shootings qualified as an "accident" under the policy. *Id*. at 293. "The extraordinary shooting spree embarked upon by [the son] resulting in injuries to [the victims] cannot be said to be the natural and expected result of [his parent's] alleged acts of negligence." *Id*. The "injuries were caused by an event so unexpected, undesigned and fortuitous as to qualify as accidental within the terms of the policy." *Id*.

35

Here, in contrast, Hymed's claimed injury is the use of ink, toner, and time that was caused by the receipt of junk faxes. Those injuries are the natural and expected result of the intentional sending of faxes, a far cry from Pennsylvania's definition of an "accident." Though it did not intend injury, Stevens & Ricci clearly intended for the third-party advertiser to send the fax advertisements to the members of the class. Barring a problem with the communication devices, the sending of faxes necessarily results in the receipt of faxes, and any sender of a fax knows that its recipient will need to consume paper and toner and will temporarily lose the use of its fax line. That does not happen by accident. While the Supreme Court of Pennsylvania has not addressed whether unintended damages from faxes sent in violation of the TCPA constitute an "accident," we predict that the court would reject coverage under the "property damage" provision of the Policy.[22]

In its effort to manufacture a conflict, Hymed next claims that Arizona law would cover its claim as an "accident." Unfortunately for Hymed, Arizona law defines an "accident" much the same way as does Pennsylvania law:

---

[22] In reaching that conclusion, we are guided and persuaded by the extensive analysis of the United States District Court for the Eastern District of Pennsylvania, which applied Pennsylvania law in the closely analogous case of *Melrose Hotel Co. v. St. Paul Fire & Marine Insurance Co.*, 432 F. Supp. 2d 488 (E.D. Pa. 2006) (rejecting coverage under "accident" provision of insurance policy when a third-party vendor sent unsolicited fax advertisements in violation of the TCPA), *aff'd*, 503 F.3d 339 (3d Cir. 2007) (judgment order).

[A]n effect which was or should have been reasonably anticipated by an insured person to be the natural or probable result of his own voluntary acts is not accidental. Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances.

*Cal. State Life Ins. Co. v. Fuqua*, 10 P.2d 958, 960 (Ariz. 1932); *see Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 547 (Ariz. Ct. App. 2007) ("Whether an event is accidental is evaluated from the perspective of the insured. … [A]n accident is anything that happens or is the result of that which is unanticipated and takes place without the insured's foresight or expectation or intention." (citations and internal quotation marks omitted)). Following that definition, as a matter of Arizona law just as under Pennsylvania law, the use of ink, toner, and time can be regarded as the natural result of the intentional sending of faxes.[23]

---

[23] Hymed primarily relies on two cases in its effort to demonstrate that the unintentional damage from the sending of the faxes is covered by the Policy as interpreted under Arizona law – *Transamerica Insurance Group v. Meere*, 694 P.2d 181 (Ariz. 1984), and *Phoenix Control Systems, Inc. v. Insurance Co. of North America*, 796 P.2d 463 (Ariz. 1990). The question in *Transamerica* was whether an insurance contract that excluded intentional injury would cover damages inflicted by an insured acting in self-defense. The

Supreme Court of Arizona held that, when an insured acts properly in self-defense, resulting injury will be covered because, although "[t]he law presumes he intended the result which was the natural consequence of his intentional act," one acting in self-defense is "confronted with a risk over which he ha[s] little control." 694 P.2d at 188-89. The court thus relied partly on the underlying purpose of insurance: protecting "against risks that are outside [the insured's] control." *Id*. at 185. It would be inconsistent with that purpose to exclude coverage for an insured who is simply "attempting to avoid a 'calamity' which has befallen him." *Id*. at 186. But insurance is not meant to allow an insured to act wrongfully "with the security of knowing that his insurance company will 'pay the piper' for the damages." *Id*.

Similarly, *Phoenix Control* involved a situation in which the insured acted under a claim of right or justification. There, the insured intended to use copyrighted material, but did so under a belief "that he had the 'legal right' to use the information because it was in the public domain." 796 P.2d at 468-69. That belief "was based on advice of counsel." *Id*. at 469. Following *Transamerica*, the Supreme Court of Arizona held that summary judgment in favor of the insurer was improper because the insured's subjective intent in using the materials was a disputed fact. *Id*. at 469-70. In reaching that holding, the court noted that, "[b]efore a court may inquire into the insured's subjective intent, the facts must indicate that the insured was provoked, privileged, or justified in acting." *Id*. at 468. Contrary to Hymed's argument, *Transamerica* and *Phoenix Control* do not require coverage for all insureds who merely assert that they did not intend the injury caused. Where no "affirmative claim of [a] privilege" exists, *Transamerica*, 694 P.2d at 183, Arizona law demands

38

We conclude that there is no conflict between Pennsylvania and Arizona law on the question of whether the damage to the class members is covered under the Policy's definition of "property damage." Under either states' law, there is no coverage because the alleged injury was not the result of an "accident." It was, instead, the foreseeable result of the intentional sending of faxes to the class recipients.

Finally, Hymed argues that coverage is available because the damage to class members from receipt of the junk faxes qualifies as "advertising injury" under the Policy. Because Hymed does not contend that the Arizona definition of "advertising injury" differs from that of Pennsylvania, we look to Pennsylvania law to answer that question.[24] We again

---

that an insured be held responsible for the foreseeable results of his or her actions. Insurance coverage does not insulate an insured who "claim[s] that he did not intend the precise injury – in character or magnitude – that in fact occurred." *Id.* at 189.

[24] As previously discussed, Hymed relies on its misapprehension of Arizona law regarding the "reasonable expectations of the insured" exception as a way to survey the nationwide legal landscape and to argue that Arizona law has incorporated Hymed's preferred definition of "advertising injury." Although Hymed cites law from a number of jurisdictions to support its argument that "advertising injury" coverage exists here, it omits any citations from one notable jurisdiction: Arizona. Given the absence of any proper argument or even citation to Arizona law, we apply the law of Pennsylvania.

conclude, as did the District Court, that the claimed injury falls outside of the scope of the Policy's coverage.

The Policy defines "advertising injury" as, among other things: "Oral or written publication of material that violates a person's right of privacy." (J.A. at 573.)[25] Although the Policy does not define the term "privacy," numerous state and federal courts have considered whether violations of the TCPA are covered by insurance policies that include similar or identical language to that at issue here. Of particular note is the decision of the Pennsylvania Superior Court in *Telecommunications Network Design v. Brethren Mutual Insurance Co.* ("*Brethren*"), which collects cases that organize the covered "right of privacy" into two broad categories: the privacy interest in secrecy and the privacy interest in seclusion. 5 A.3d 331, 335-36 (Pa. Super. Ct. 2010). Secrecy- based privacy rights protect private information, while seclusion-based privacy rights protect the right to be left alone. The TCPA protects only the latter category of privacy interest, by shielding people from unsolicited messages. The content of the messages (*i.e.*, whether they include private information) is immaterial under the TCPA. "Congress took aim at unsolicited advertisements,

---

[25] The Policy also defines "advertising injury" as: "Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services"; "Misappropriation of advertising ideas or style of doing business"; and "Infringement of copyright, title or slogan." (J.A. at 573.) Hymed does not argue that its damages fall under any of those three definitions, so we do not address them, except in the comparative way noted hereafter.

not the content of those advertisements." *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 502 (E.D. Pa. 2006), *aff'd*, 503 F.3d 339 (3d Cir. 2007) (judgment order). The sending of unsolicited faxes does not necessarily result in the dissemination of confidential information. Rather, "an unsolicited fax intrudes upon the right to be free from nuisance." *Id*. at 501. "Accordingly, the TCPA seeks to protect privacy interests in seclusion, not secrecy." *Id*. That purpose is consistent with the type of injury that Hymed alleged in its complaint, saying, "[t]he [Stevens & Ricci] faxes unlawfully interrupted the … class members' privacy interests in being left alone." (J.A. at 550.)

The Policy does not cover that injury. Read in context, the Policy provides coverage only for violations of the privacy interest in secrecy, and thus does not cover violations of a right to seclusion. This is amply demonstrated by the other three offenses that the Policy includes within the definition of "advertising injury": "Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services"; "Misappropriation of advertising ideas or style of doing business"; and "Infringement of copyright, title or slogan." (J.A. at 573.) All three of those offenses – slander, misappropriation, and infringement – "focus on harm arising from the *content* of an advertisement rather than harm arising from mere *receipt* of an advertisement." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 551 (7th Cir. 2009) (interpreting an identical "advertising injury" provision to exclude coverage for the sending of unsolicited faxes). That content-dependent coverage clarifies the scope of the Policy's "advertising injury" provision: it protects against injuries caused by the improper content of a published

41

advertisement.[26]  The Policy's protection of the "right of privacy" is thus logically limited to a privacy interest the infringement of which depends upon the content of the advertisements: in other words, the privacy right to secrecy.

None of the allegations in the Underlying Action relate in any way to the content of the faxed advertisements.  The faxes caused the alleged damage because they were received without permission, not because of their content.  At no point did Hymed allege that those unsolicited faxes included confidential or otherwise secret information about any of the class members.  Because the Policy's "advertising injury" deals only with the publication of private information, it strongly suggests that the injury alleged in the Underlying Action falls outside of the scope of that protection.

And what the provision's context suggests its plain text confirms.  Again, as relevant here, the Policy defines "advertising injury" to include "[o]ral or written publication *of material* that violates a person's right of privacy."  (J.A. at 573 (emphasis added).)  In that definition, the phrase "that violates a person's right of privacy" modifies the term "material."  *See Pa. Dep't of Banking v. NCAS of Del., LLC*,

---

[26] *See Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997) ("[A]n insurance policy, like every other written contract, must be read in its entirety and the intent of the policy is gathered from consideration of the entire instrument."); *Northway Vill. No. 3, Inc. v. Northway Props., Inc.*, 244 A.2d 47, 50 (Pa. 1968) ("[T]he meaning of words may be indicated or controlled by those words with which they are associated.  Words are known by the company they keep.").

948 A.2d 752, 760 (Pa. 2008) ("[T]he last antecedent rule …
advises that a proviso usually is construed to apply only to the
provision or clause immediately preceding it."); *Buntz v. Gen.
Am. Life Ins. Co.*, 7 A.2d 93, 95 (Pa. Super. Ct. 1939)
(applying rule of the last antecedent to the interpretation of an
insurance contract).[27]  Thus, it must be the "material" itself,
rather than its "publication," that violates a person's right of
privacy.  *See ACS Sys., Inc. v. St. Paul Fire & Marine Ins.
Co.*, 53 Cal. Rptr. 3d 786, 796 (Cal. Ct. App. 2007)
(construing analogous provision and concluding "that
'material' is not only the last antecedent of 'that' but is also
its only antecedent").  That "would be the case only if the
material contained confidential information and violated the
victim's right to secrecy."  *State Farm Gen. Ins. Co. v. JT's
Frames, Inc.*, 104 Cal. Rptr. 3d 573, 586 (Cal. Ct. App. 2010)
(using the rule of the last antecedent to construe identically-
worded provision).  The text of the relevant provision of the
Policy, as well as its broader context, thus compels a content-
dependent view of the privacy interest meant to be protected.

Of course, our ultimate endeavor is to apply
Pennsylvania law to determine the scope of the Policy's
"advertising injury" provision.  Although the Supreme Court
of Pennsylvania has not addressed that question, the Superior
Court in *Brethren* interpreted verbatim contract language and
reached the same conclusion as we do here, for largely the

---

[27] We recognize that the rule of the last antecedent is
"not an absolute and can assuredly be overcome by other
indicia of meaning ... ."  *Barnhart v. Thomas*, 540 U.S. 20, 26
(2003).  But here, those other indicia of meaning – the
surrounding language already described – confirm the rule's
applicability rather than undermine it.

43

reasons we have addressed. *Brethren*, 5 A.3d at 337. We regard decisions of an intermediate appellate court as "indic[ative] of how the state's highest court might decide the issue." *McGowan v. Univ. of Scranton*, 759 F.2d 287, 291 (3d Cir. 1985) (internal quotation marks omitted). Such decisions can even constitute "presumptive evidence" of state law. *Nat'l Sur. Corp. v. Midland Bank*, 551 F.2d 21, 30 (3d Cir. 1977). We emphasize that this case raises the exact same question as did *Brethren* – the policy language is identical, the underlying TCPA violation is identical, and the claimed damages for that violation are identical.[28] We thus defer to the intermediate appellate court's decision as a well-reasoned interpretation of Pennsylvania state law.[29]

---

[28] *Brethren* also represents a validation of the earlier prediction of state law made by the Eastern District of Pennsylvania in *Melrose Hotel*, "which applied Pennsylvania policy interpretation rules to an insurance policy containing a nearly identical clause to that in the instant matter and concluded that there was no duty to defend." *Brethren*, 5 A.3d at 336 (citing *Melrose Hotel*, 432 F. Supp. 2d 488).

[29] Hymed argues that the Policy's "advertising injury" definition "provides coverage for violations of all rights of privacy." (Opening Br. at 26.) It does so by contrasting the Policy's coverage for "*publication* of material that violates a person's right of privacy" (J.A. at 573 (emphasis added)), with the "advertising injury" language in *Melrose Hotel*, which extended coverage to the act of "[*m*]*aking known to* any person or organization covered material that violates a person's right to privacy," 432 F. Supp. 2d at 491 (emphasis added). According to Hymed, the "making known to" formulation makes abundantly clear the content-dependent

44

## III.  CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

---

nature of the insurance coverage, whereas the "publishing" language of the Policy here requires coverage by virtue of the mere act of sending a fax, regardless of its content.  Hymed finds support for this distinction primarily in a First Circuit decision applying Massachusetts law.  *See Cynosure, Inc. v. St. Paul Fire & Marine Ins. Co.*, 645 F.3d 1, 3-4 (1st Cir. 2011) (Souter, J., retired).  That distinction is unpersuasive as a matter of Pennsylvania law, however, in light of the Commonwealth's definition of "publication" with respect to claims of invasion of privacy, which requires dissemination to the public at large.  *OneBeacon Am. Ins. Co. v. Urban Outfitters, Inc.*, 21 F. Supp. 3d 426, 436-37 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 177, 180 (3d Cir. 2015).  And, given *Brethren*'s contrary conclusion interpreting Pennsylvania law, the First Circuit's view of Massachusetts law provides scant support for Hymed's argument.  Were that not enough, we also note that the Seventh Circuit has twice concluded that the same "publication" language covers only invasions of the privacy interest in secrecy.  *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 551 (7th Cir. 2009); *Am. States Ins. Co. v. Capital Assocs. of Jackson Cty., Inc.*, 392 F.3d 939, 942-43 (7th Cir. 2004), *declined to follow by Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 323 (Ill. 2006).

45

GREENAWAY, JR., *Circuit Judge*, dissenting,

I would dismiss for lack of subject matter jurisdiction. In deciding that the amount-in-controversy threshold is satisfied, the majority adopts the reasoning in *Meridian Security Insurance Company v. Sadowski*, 441 F.3d 536, 539 (7th Cir. 2006), to conclude that the rule against aggregation does not apply to this declaratory judgment action because "at the time of filing of the declaratory judgment complaint, Auto-Owners's quarrel was with Stevens & Ricci regarding its indemnity obligation under the Policy . . . [and] [i]ts dispute was thus with its insured, not the class." Majority Op. at 21. I write separately because I am unconvinced that this approach is permissible in light of the anti-aggregation rule, and believe that, in reaching its conclusion, the majority obfuscates our jurisprudence in two important areas.

First, the majority's view that the instant controversy is "unitary" is questionable as a practical matter and creates tension with our previous decisions. Plaintiff-Appellee Auto-Owners Insurance Company named Appellant Hymed Group Corporation as a defendant in its declaratory action "in the hope of attaining a binding judgment against both the insured and the injured party," *American Automobile Insurance Company v. Murray*, 658 F.3d 311, 319 (3d Cir. 2011); moreover, Hymed, not Stevens & Ricci, Inc., has been defending the suit from the beginning. In other words, we are not presented with a unitary controversy between Auto-Owners and Stevens & Ricci because, in reality, the presence of Hymed reflects the fact that a "controversy exist[s] between the insurance company and the injured [parties]." *Id*. at 319.

It is hard to conceive of what controversy actually exists between Auto-Owners and Stevens & Ricci given the fact that Stevens & Ricci has not so much as entered an appearance in the matter. As Auto-Owners itself states in its Brief: "Hymed and Auto-Owners are the parties currently engaged in the 'real dispute' that has reached this Court on appeal . . . and Hymed (and the class members) are the only ones that have a financial interest in the coverage issue . . . ." Appellee's Supp. Br. at 12.

The notion that insurance coverage disputes occur only between the insurance company and its insured fits uneasily with our Article III standing decisions in which we have stressed that parties like Hymed have a significant stake. *See Murray*, 658 F.3d at 319 (explaining that an injured party has a "particularized interest" in an insurance coverage suit "because a determination of . . . coverage would dictate its ability to receive the full benefit of the . . . lawsuit"); *see also Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 354 (3d Cir. 1986) ("Concluding that the injured party has an independent, and not a derivative right, to be heard, is not only jurisprudentially sound, but is also realistic[.]").

As the majority notes, the import of its decision is that parties like Hymed cannot assert federal jurisdiction in declaratory actions seeking similar relief. In my view, this retreats from our previous decisions emphasizing the particularized interest of the injured party. The majority observes that "[s]tanding and amount-in-controversy are two distinct inquiries." Majority Op. at 22. It misses the point. My uneasiness with the majority's characterization of coverage disputes arises from the practical anomaly of the real party in interest losing part of its stake in the suit.

2

Further, I believe that the majority's approach is essentially a run around the anti-aggregation rule. We have prohibited measuring the amount-in-controversy by the defendant's total cost on the basis that it violates anti-aggregation principles. In *Packard v. Provident National Bank*, 994 F.2d 1039, 1050 (3d Cir. 1993) we stressed that "allowing the amount in controversy to be measured by the defendant's cost would eviscerate *Snyder [v. Harris*, 394 U.S. 332 (1969)]*'s* holding that the claims of class members may not be aggregated in order to meet the jurisdictional threshold," and thus declined to do so.

The majority's response to this reasoning is that it is not aggregating but rather assessing the amount-in-controversy as the total "value of the right being litigated" from the perspective of Auto-Owners. Majority Op. at 24. On this point, the majority invokes the plaintiff's viewpoint rule, under which the test for determining the amount-in-controversy relies solely on the value of the benefit to the plaintiff. In other words, the majority believes that because the defendant in the underlying action is now the plaintiff, the reasoning in *Packard* does not apply.

But the majority's approach does not actually elude the aggregation of class members' claims. This becomes clear if we consider courts' treatment of the "either viewpoint" approach, under which the amount-in-controversy is based on the pecuniary result to either party that would be produced by the judgment. *See* 14AA Charles A. Wright et al., *Federal Practice and Procedure* § 3702.5 (4th ed. 2016).

Courts addressing the either-viewpoint approach have declined to adopt the rule in suits involving class actions, for the simple fact that total cost is the same as aggregation. *See*

3

*In re Ford Motor Co./Citibank (South Dakota), N.A.*, 264 F.3d 952, 958 (9th Cir. 2001). This is exactly what we explained in *Packard*: aggregation is not avoided by shifting perspective or semantics—whether one calls it "total cost" or "total detriment," or "value of the right being litigated," if one arrives at that total through aggregation of individual claims, it violates *Snyder*. Concluding otherwise, we explained, disturbs long-standing anti-aggregation principles.

The Ninth Circuit Court of Appeals has made the same point. In *Ford Motor Co.*, 264 F.3d at 958, class-action plaintiffs seeking injunctive relief invoked the "either viewpoint" rule and argued that the amount-in-controversy should be viewed as the total detriment to the defendant. The court rejected this approach, because of the "inherent conflict" between the application of the approach and the anti-aggregation rule, explaining that "'total detriment' is basically the same thing as aggregation, and . . . where the equitable relief sought is but a means through which the individual claims may be satisfied, the ban on aggregation applies with equal force to the equitable as well as the monetary relief." *Id.* at 959.

Here, the relief requested is different but the implications are the same. Auto-Owners asks us to view the amount-in-controversy as its total detriment on the presumption that this eludes application of the anti-aggregation rule. But the "inherent conflict" noted in *Ford* does not really disappear simply by assessing the amount-in-controversy from the plaintiff-insurance company's viewpoint. This is because in a declaratory action, the court looks to the underlying suit to determine the amount in controversy. *See e.g.*, *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995) ("[T]he amount in controversy in a

petition to compel arbitration or appoint an arbitrator is determined by the underlying cause of action that would be arbitrated.").[1] That means, regardless of party status in the declaratory action, the plaintiff's claim in the underlying suit still provides the basis from which we calculate the amount in controversy. Put differently: merely labeling the amount as the "total amount the insurance company will owe" does not sidestep the fact that, practically speaking, we are deriving that amount by aggregating the individual claims of the class members in the underlying suit.[2]

The majority believes that its approach is "consistent" with *Ford*. Majority Op. at 23. I disagree. *Ford* straightforwardly explained that it would not consider the total detriment of the defendant in reaching the amount in controversy because "total detriment" and "aggregation" are one and the same. Here, the majority concludes that total detriment and aggregation are not the same simply because

---

[1] The majority calls this approach unprecedented. But we have clearly suggested as much in *Jumara*. Further, the proposition that we look to the underlying suit to determine the amount in controversy is apparent as a matter of common sense.

[2] This is so even if we adopt the fiction that because declaratory relief is sought, the controversy becomes unitary, only involving the insurer and its insured. Even viewing this suit in this way, we do not derive the amount of controversy out of thin air—rather, we must look to the value of damages sought in the underlying suit.

the insurance company is the plaintiff in the declaratory action. Rather than being consistent with *Ford*, the majority skirts the relevant point of *Ford* through a narrow focus on party status.

Thus to calculate the amount-in-controversy, I would do what our precedents suggest: look to Hymed's underlying suit to determine the amount in controversy. In doing so, it is clear to a legal certainty that the amount-in-controversy is not met. No single class member's claim would exceed, or even come close to, the $75,000 threshold.

To be sure, the total amount potentially owed by Auto-Owners also falls short of the $75,000 threshold. The majority attempts to overcome this problem by tacking onto the amount the cost of hypothetical attorneys' fees. I also depart from this approach. Generally, attorneys' fees are not considered a part of the amount-in-controversy. 28 U.S.C. § 1332(a); *see also* 14AA Charles A. Wright et al., *Federal Practice and Procedure* § 3712 (4th ed. 2016). We have referenced a narrow exception to this rule when "the contracts at issue called for the payment of attorneys' fees and costs by the party breaching the contract." *State Farm Mut. Auto Ins. Co. v. Powell*, 87 F.3d 93, 98 (3d Cir. 1996). The policy between Auto-Owners and Stevens & Ricci (the "Policy") is not an instrument of this sort.

The majority relies on *Powell* in concluding that attorneys' fees are duly included here, but that case provides only apparent support. In *Powell*, we *declined* to include arbitration costs in the amount-in-controversy because the policy at issue did "not specifically impose a duty to pay on the part of the [insurance company]." *Id.* Similarly, the Policy contains no provision specifically imposing on Auto-

6

Owners a duty to pay attorneys' fees and costs. While the majority points out that the Policy imposes on Auto-Owners a general "duty to defend," this duty only applies to suits that fall within coverage. Thus, it is not an unconditional requirement from which we could comfortably speculate as to costs that may be incurred.

The way the majority presents it, it might appear that *Powell* straightforwardly adopts the position it embraces. Not so. The full text of the language cited by the majority is as follows:

> As an initial matter, we question the reasoning of the district court's decision in [*Nationwide Mutual Insurance Company v. Rowles by Rowles*, 818 F. Supp. 852 (1993)]. In arriving at its conclusion, the *Rowles* court relied upon two cases, [*Springstead v. Crawfordsville State Bank*, 231 U.S. 541 (1913)] and [*Farmers Insurance Company v. McClain,* 603 F.3d 821 (10th Cir. 1979)] which held that costs and attorneys' fees should be considered part of the amount in controversy for jurisdictional purposes when they are mandated by underlying instruments or contracts. In those two cases, however, the contracts at issue called for the payment of attorneys' fees and costs by the party breaching the contract.

*Id.* at 98. What should be readily apparent is that the majority takes *Powell* out of context. There, we did not hold that "costs and attorneys' fees should be considered part of the amount in controversy for jurisdiction purposes when they are mandated by underlying instruments or contracts;" we merely

7

cited a district court case that made a conclusion to that effect. The upshot of *Powell*'s holding is more limited—it is, where an underlying instrument does not "specifically impose a duty to pay" fees and costs, such costs are not duly included in the amount in controversy. *Id.*

To be clear, I would agree that where a contract requires a breaching party to pay attorneys' fees, those may be considered part of the amount in controversy—after all, in those contexts, "the costs [are] essentially additional damages to be assessed against the party found to have breached the instrument." *Id.* This narrow exception to the general prohibition does not apply here. Whatever fees and costs flowed from Auto-Owners's duty to defend in its subsequent defense of Stevens & Ricci are entirely forward-looking—and as the majority opines, "federal diversity jurisdiction is generally determined based on the circumstances prevailing at the time the suit was filed." Majority Op. at 22 (citing *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 152 (3d Cir. 2009). And these costs are not "essentially additional damages" Auto-Owners owes to Stevens & Ricci or vice versa, especially not as it relates to the *declaratory judgment action*. It would be a different scenario if Stevens & Ricci sued Auto-Owners for breach of the Policy's duty to defend. But that is not the situation we are presented with here.

In sum, the inclusion of attorneys' fees here is an unnecessary expansion of our jurisprudence for which the majority articulates no basis.[3] The majority believes that

---

[3] The majority cites an influential treatise for the proposition that the law in this area is "quite settled." Majority Op. at 25–26 n.18. However, one treatise does not law make. And, a closer look at the cases collected in that

8

those fees are an "inseparable" part of the controversy and to ignore them is to "ignore the reality of what is at stake in this litigation." Majority Op. at 26. But in my view, by including these fees, the majority ignores the express language of 28 U.S.C. § 1332(a) in the absence of any support from our Court.

"It is axiomatic that federal courts are courts of limited jurisdiction, and as such are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case." *Packard*, 994 F.2d at 1049 (citations omitted). Here, I am afraid the majority has "ben[t] over

---

treatise demonstrates that what is "quite settled" is that where an underlying contract contains a fee-shifting provision, attorneys' fees may be included in the amount-in-controversy, a point I do not dispute. *See* 14AA Charles Alan Wright et al., Federal Practice & Procedure § 3712 (4th ed. 2016). What is less settled, and has received less circuit attention, is the context we are presented with here—with only one circuit sharing the majority's view and other circuits employing a similar approach only where the relevant defense or indemnification occurs before the declaratory suit is brought. *See Stonewall Ins. Co. v. Lopez*, 544 F.2d 198, 199 (5th Cir. 1976) (per curiam) (cost of insurer's prospective defense of insured provides basis for including attorneys' fees); *S. Ariz. York Refrigeration Co. v. Bush Mfg. Co.*, 331 F.2d 1, 18 (9th Cir. 1964) (attorneys' fees included when defense has already occurred and indemnitor refused to defend); *Farmers Ins. Co. v. McClain*, 603 F.2d 821, 823 & 823 n.3 (10th Cir. 1979) (attorneys' fees included when defense has already occurred). Far from settled then, the circuit law addressing this particular question is limited and inconclusive.

backwards . . . to persuade itself that subject matter jurisdiction exists." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 718 (7th Cir. 2012).

Thus, because of the difficult fit between the majority's reasoning and our Article III standing jurisprudence in similar contexts, the tension between the insurance-company viewpoint approach and the anti-aggregation rule, and my reservations regarding the inclusion of the attorneys' fees to reach the amount-in-controversy, I am not satisfied of our jurisdiction over this dispute. I would dismiss the appeal on that ground and therefore respectfully dissent.