UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3705
_____

WESTPORT INSURANCE CORPORATION

v.

PETER G. MYLONAS;
LAW OFFICES OF PETER GEORGE MYLONAS, P.C.;
ANASTASIOS PAPADOPOULOS


Anastasios Papadopoulos,
                                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(E.D. Pa. No. 2-14-cv-05760)
District Judge: Honorable Joel H. Slomsky
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 10, 2017
_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL, *Circuit Judges*.

(Opinion Filed: August 4, 2017)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

## I.  INTRODUCTION

Appellant Anastasios Papadopoulos brought a lawsuit against his former attorney, Appellee Peter Mylonas, with a complaint that alleged three causes of action and, arguably, up to eight discrete wrongful acts.  Mylonas' insurer, Appellee Westport Insurance Company ("Westport"), filed this declaratory judgment action asking whether that lawsuit constituted a single claim—covered up to a $500,000 limit under Mylonas' professional liability insurance policy—or multiple claims covered up to $1 million.[1] The District Court found that, under the terms of the policy, the single suit constituted a single claim.  Papadopoulos appeals that ruling.  We will affirm.

## II.  BACKGROUND

In 2011, Papadopoulos filed suit against Mylonas and his law firm, Peter G. Mylonas, P.C. (collectively, "Mylonas").  He had retained Mylonas to advise him in connection with the formation of a corporation, Corinthian Marble and Granite, Inc.  The suit alleged that Mylonas negligently transferred Corinthian stock without the consent of the shareholders, as required by the corporate documents Mylonas had prepared, resulting in Papadopoulos losing his company and its assets.  The Complaint included three counts, each of which were based on these allegations.  First, Papadopoulos pled negligence, alleging that Mylonas negligently transferred the stocks.  Second, he pled breach of

---

[1] Additional issues were resolved by the District Court on a motion to dismiss and were not appealed.

fiduciary duties, "for all reasons so stated above." R 628. Third, he pled breach of contract, asserting that Mylonas had contractually agreed to advise him on how to form a corporation and to "a continued representation of plaintiff's interests." R 628. Mylonas allegedly breached that duty because he "negligently transferred shares." R 628.

The suit went to trial, where Mylonas was defended by counsel, whose expenses were paid by Westport. At trial, Papadopoulos presented an expert witness whose report concluded that Mylonas had committed at least five separate breaches of his professional standard of care.[2] A jury returned a $525,000 verdict in favor of Papadopoulos.

Mylonas' professional liability insurance policy with Westport ("the Policy") limits coverage to $500,000 per claim, or $1,000,000 in the aggregate. The difference is substantial in this case, as Westport's defense costs—here $420,000—count against the limits.

The parties cite three specific provisions of the Policy as relevant to determining whether Papadopoulos made one claim or more. First, the definition of "claim" is set forth as "a demand made upon any INSURED for LOSS, as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of arbitration proceedings or administrative proceedings against any INSURED." R 658. Second, "potential claim" is defined as "any act, error, omission, circumstance or

---

[2] Specifically, these were 1) an illegal transfer of Corinthian stock, 2) an illegal issuance of Corinthian stock, 3) the negligent drafting of a loan document, 4) the transfer of the corporate books to a third-party attorney, and 5) failures to communicate and disclose conflicts. These acts took place between April 2008 and April 2009. In his briefing, Papadopoulos now identifies eight separate wrongful acts.

3

PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY" or as "any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED." R 666. Finally, the Policy's section on "Multiple Insureds, Claims and Claimants" provides:

> Two or more CLAIMS arising out of a single WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, or a series of related or continuing WRONGFUL ACTS, shall be a single CLAIM. All such CLAIMS . . . are subject to one "Per Claim Limit of Liability" and deductible.

R 656.

### III.   STANDARD OF REVIEW[3]

We "exercise plenary review over an order resolving cross-motions for summary judgment, applying the same standard that the lower court was obligated to apply under Rule 56." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (internal citations and quotation marks omitted). Thus, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We rule on each party's motion individually, making inferences and viewing the evidence in the light most favorable to each non-moving party, in turn. *Auto–Owners Ins. Co.*, 835 F.3d at 402.

### IV.   ANALYSIS

Under Pennsylvania law, the interpretation of an insurance contract is a matter of law. *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391 (3d Cir. 2012). To

---

[3] The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

4

interpret the policy, "we must ascertain the intent of the parties as manifested by the language of the written agreement." *Id.* (quoting *Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1235 (Pa. 1994)). As such, the "polestar of our inquiry . . . is the language of the insurance policy." *Madison Constr. Co. v. Harleysville Mut. Ins. Co*., 735 A.2d 100, 106 (Pa. 1999). If the language is ambiguous, it is construed against the insurer. *Id.* However, the courts will not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Id.*

The Policy is unambiguous. It states plainly the lower, per-claim limit applies if the underlying state lawsuit was a single claim. The per claim limit also applies if there were multiple claims, but they arose out of a series of related or continuing wrongful acts. Thus, Papadopoulos must show that Mylonas made multiple claims, arising out of unrelated, non-continuous wrongful acts. We need not reach questions of relatedness, here because the plain language of the Policy makes clear that this was a single claim.

We begin, as we must, with the Policy definition of "claim." A claim is not the underlying wrong or wrongs, but rather the demand for loss made upon the insured party—and in particular "service of suit." Thus, by its very definition, one demand for loss is one claim. Here, Papadopoulos served Mylonas with one suit. He made only one demand for redress of his losses: that same suit. Based on the definition of "claim," only one claim was made.

This textual argument is further bolstered by the definition of "loss." A loss is "the monetary and compensatory portion of any judgment, award or settlement," not including fines, sanctions, punitive damages, and the like. R 666. Here, there was only a

5

single loss: one $525,000 judgment against Mylonas. Under the definitions set forth in the Policy, Mylonas incurred a single "loss," for which he made a single "claim" against his insurer.[4] The per-claim limit applies.

Papadopoulos offers a variety of arguments for why the Policy does not say what it clearly says, but none gets him very far. His primary argument based on the Policy text is that the definition of "claim" actually governs only the form in which an insured party must make its demand. According to him, the nature of a "claim," and what makes various acts constitute a single claim or multiple, is instead illustrated by the definition of "potential claim," which focuses on the errors and breaches of duty committed by the insured. But the Policy imposes a limit "per claim," not per "potential claim." To define "claim," we look to the definition of "claim."[5]

The two District Court cases cited by Papadopoulos do not cause us to reach a different conclusion. *Westport Ins. Corp. v. Law Offices of Marvin Lundy*, No. CIV.A. 03-CV-3229 (MMB), 2004 WL 555415, at *7-8 (E.D. Pa. Mar. 19, 2004), and *Ackerman*

---

[4] We need not decide whether a single suit involving truly separate losses (perhaps identified separately by the jury or at least calculated separately at trial) would still be a single claim. That is not this case. Here, even though the jury completed a nine-question special verdict sheet, it was asked for and returned a single damages figure across all three causes of action.

[5] To the extent that we would draw any conclusions about the policies underlying the Policy from the separate and inapplicable "potential claim" definition, which we do not, they would not support Papadopoulos. The potential claim language is relevant to the timing of claims: if the insured notifies the insurer of a potential claim during the policy period, the eventual claims arising out of it can be treated as having been made during the policy period. For notice purposes, it makes sense that the Policy would look to wrongful acts, each of which could ripen into a demand for loss. There is no reason to think, though, that each potential claim must ultimately evolve into a discrete claim.

*v. Westport Ins. Corp.*, No. 06-4142 (JLL), 2008 WL 4205749, at \*5 (D.N.J. Sept. 8, 2008), each discuss the form a demand must take to constitute a "claim" under the Policy. But this does not mean that the definition of "claim" is transformed into a provision exclusively regulating the form of claims, only that questions of form were at issue in those cases. If anything, these cases underscore that the Policy definition of "claim" governs, whether in determining if a claim was made or how many claims were made.[6]

Next, Papadopoulos argues that the form of pleading cannot determine what constitutes a claim. In some sense, this is true, and has strong precedential support. *See, e.g.*, *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1265 (Cal. 1993) ("We do not suggest that the number of claims is determined by rules of pleading."); *Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 500 n.8 (3d Cir. 2002) (citing *Bay Cities* in a case decided under Pennsylvania law). But this cuts both ways: including more causes of action in a complaint does not create more claims under the Policy, nor does pleading the harm done as a greater number of discrete wrongful acts. Our analysis does not look to the terms of the underlying Complaint to determine how many claims were filed. We look only to the number of demands for loss made upon the insured —*i.e.* the number of suits served—as required by the Policy.[7] Papadopoulos suggests that this

---

[6] Indeed, *Ackerman* suggests, albeit in a somewhat different context, that an amended complaint asserting additional causes of action, but arising out of the same facts as the original complaint, does not constitute a new "claim." 2008 WL 4205749 at \*5. By implication, a single complaint—alleging various causes of action—also does not constitute multiple claims.

[7] *Bay Cities* is only of limited relevance here. There, the parties stipulated that the relevant question was whether to treat multiple claims as a single claim because they

would incentivize plaintiffs to inefficiently subdivide their suits into separate cases, in order to create multiple claims and greater insurance coverage. But the Policy accounts for this: if those suits were indeed related, they would be treated as a single claim, and no advantage would be gained.[8]

Finally, Papadopoulos argues that documentary evidence from Westport constitutes an admission that multiple claims were filed. This evidence suggests nothing of the sort. Papadopoulos quotes an email from Westport that instructs that

> Mr. Mylonas' policy is not a single $500,000 limit, rather as I indicated in our reservation of rights letters issued back on June 22, 2011 and on September 14, 2011, "This is a claims made and reported policy with liability limits of $500,000 per claim and $1,000,000 in the aggregate for the policy period."

R 1221. Westport did not state that the aggregate limit would apply or that multiple claims were being made. It simply re-stated the policy terms, accurately. This email has no bearing on our interpretation of the Policy.

---

arose out of a series of related acts, errors or omissions, and the court interpreted that policy language. 855 P.2d at 1264-65. Thus, the court concluded that "when, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney was retained—there is a *single* claim." *Id.* at 1266. In this case, however, there is no such stipulation and we need not determine whether multiple claims were related. Even so, we note that each of Papadopoulos' three causes of actions in the underlying complaint fundamentally refers back to the negligent transfer of stock.

[8] Papadopoulos also raises the specter of treating as a single claim a suit in which "two unrelated plaintiffs filed a single complaint against an attorney, with completely different factual patterns and injuries." Appellant's Br. at 28. We need not address this hypothetical situation.

## V.    CONCLUSION

Because we hold that this was a single claim based on the unambiguous definition of "claim," and therefore subject to the $500,000 per-claim limit, we need not reach the question whether the "Multiple Insureds, Claims and Claimants" provision of the Policy would treat it as a single claim and need not interpret the terms "related" or "continuing." We will affirm.